UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 JAN 31  PM 3: 39

CLERK

BY _____
DEPUTY CLERK

PAUL BETZ,                                    )
CATHERINE CAMILLETTI, and                     )
COOPERATIVE INSURANCE COMPANIES,              )
                                              )
        Plaintiffs,                           )
                                              )
        v.                                    )      Case No. 5:10-cv-102
                                              )
HIGHLANDS FUEL DELIVERY, LLC,                 )
DITECH TESTING CORPORATION,                   )
AMERICAN WELDING & TANK, LLC,                 )
HARSCO CORPORATION, and                       )
TAYLOR-WHARTON INTERNATIONAL LLC,             )
                                              )
        Defendants.                           )

**OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART DEFENDANT
DITECH TESTING CORPORATION'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 150)

This matter comes before the court on the motion for summary judgment filed by
Defendant Ditech Testing Corporation ("Ditech"), seeking judgment in its favor with
regard to Plaintiffs Paul Betz's and Catherine Camilletti's negligence claims and with
regard to its co-defendants' amended crossclaims (Doc. 150). Ditech's motion is
opposed.

The case arises out of a 2009 explosion of a propane tank (the "Propane Tank")
owned by Defendant Highlands Fuel Delivery, LLC ("Highlands"), refurbished and
recertified by Ditech, and originally manufactured by the predecessor in interest of
Defendants American Welding & Tank, LLC, Harsco Corporation, and Taylor-Wharton
International LLC (the "Harsco Defendants"). After Ditech refurbished and recertified
the Propane Tank in November of 2004, Highlands placed it on Plaintiffs' property where
it exploded and caught fire, destroying Plaintiffs' home and other property.

In their Fourth Amended Complaint, Plaintiffs assert separate negligence claims against Highlands and Ditech (Counts One and Two, respectively); a res ipsa loquitur claim and strict product liability claims against Highlands (Counts Three and Four, respectively); a strict product liability claim against "Chemitrol"[1] (Count Five), and breach of warranty and negligence claims against all defendants (Counts Six and Seven, respectively).

Ditech seeks summary judgment in its favor with regard to Plaintiffs' negligence claims against it,[2] contending that Plaintiffs do not have an expert opinion on the applicable standard of care and cannot establish the essential element of causation. Ditech seeks summary judgment with regard to the amended crossclaims of Highlands and the Harsco Defendants against Ditech, contending, as a matter of law, neither Highlands nor the Harsco Defendants has a cause of action against Ditech arising out of the explosion of the Propane Tank.

Plaintiffs are represented by Daniel P. Richardson, Esq., David A. Camilletti, Esq., Mark E. Utke, Esq., and Richard Pastene Foote, Esq.[3] Ditech is represented by Barbara R. Blackman, Esq. and Pietro J. Lynn, Esq. Highlands is represented by John A. Hobson, Esq. The Harsco Defendants are represented by Potter Stewart, Jr., Esq.

The court heard oral argument on the pending motion on October 24, 2012.

## I.    Factual Background.

### A.    Undisputed Facts.

On April 9, 2009, the Propane Tank, a 500 gallon American Society of Mechanical Engineers ("ASME") tank exploded on Plaintiffs' property, destroying their

---

[1]  The Harsco Defendants have assumed the defense of Plaintiffs' claims against Chemitrol Chemical Co. ("Chemitrol").

[2]  Ditech identifies Count Two of Plaintiffs' Complaint as the only negligence claim against it (Doc. 150 at 4), however, Count Seven alleges a negligence claim against all Defendants so the court assumes that Ditech seeks summary judgment with regard to that claim as well.

[3]  Plaintiff Cooperative Insurance Companies is represented by Daniel P. Richardson, Esq. and Richard Pastene Foote, Esq.

home, greenhouses, and other property. Chemitrol, a company subsequently acquired by the Harsco Defendants, manufactured the Propane Tank in 1970. Highlands, which owned the Propane Tank, hired Ditech to refurbish and recertify it. There is no written contract documenting their agreement. Ditech refurbished the Propane Tank on November 26, 2004 in its refurbishing plant and recertified it for continued use.

Ditech's employee, Stephen Melanson, had primary responsibility for refurbishing the Propane Tank and was also designated by Ditech to testify on its behalf pursuant to Fed. R. Civ. P 30(b)(6). Mr. Melanson held the title of "Responsible Inspector" in November 2004. According to Mr. Melanson, in refurbishing AMSE propane tanks, Ditech has adopted ASME Standard, Appendix H from the National Board Inspection Code as its policies and procedures for the refurbishment of propane tanks. On its cover sheet, Appendix H states that it is a "Recommended Guide for the Inspection of Pressure Vessels in LP Gas Service – Nonmandatory." (Doc. 204-3 at 2.) Appendix H sets forth several steps for examining a propane tank to determine whether it is appropriate for refurbishing or is too damaged to be reused. It first calls for a "review of the known history" of the tank,[4] id. at 3, followed by a visual inspection of the tank. With regard to the type of inspection required, Section H-3000 of Appendix H provides:

> The type of inspection given to pressure vessels should take into consideration the condition of the vessel and the environment in which it operates. The inspection may be external or internal, and use a variety of non-destructive examination methods. Where there is no reason to suspect an unsafe condition or where there are no inspection openings, internal inspections need not be performed. The external inspection may be performed when the vessel is pressurized or depressurized, but shall provide the necessary information that the essential sections of the vessel are of a condition to operate.

(Doc. 204-3 at 3.) (Section H-3000). According to Mr. Melanson, Ditech is not a licensed ASME refurbisher although he does not know what that term means or whether

---

[4] This includes a review of the tank's: "(a) Operating conditions"; "(b) Normal contents of the vessel"; "(c) Results of any previous inspection"; "(d) Current jurisdictional inspection certificate, if required"; "(e) ASME Code Symbol Stamping or mark of code of construction, if required"; "(f) National Board and/or jurisdictional registration number, if required." (Doc. 204-3 at 3.)

licensing is required as a condition precedent to ASME tank refurbishment. Mr. Melanson was given a copy of Appendix H by Ditech and was instructed to read and follow it, but he does not recall receiving any specific training regarding it.

In reviewing a propane tank's known history, Ditech's practice is to record information from the tank's data plate, which contains information such as the tank's manufacturer and date of original manufacture. Mr. Melanson acknowledged that the accuracy of the information recorded is important and that it is contrary to Ditech's policies and procedures to record this information inaccurately. If the data plate on a tank cannot be found, or is illegible, Ditech's policy is to remove the tank from service and to not refurbish it. It is also Ditech's practice to notify the customer or owner. Mr. Melanson acknowledged that an "unsafe condition" is any condition that would give rise to the rejection of the tank for refurbishment.

Ditech's practice is to refrain from performing internal tank inspections unless this type of inspection is requested by a customer. Mr. Melanson acknowledged that Ditech's policies and procedures governing tank inspections are contrary to Appendix H. He acknowledged that without an internal inspection, it is impossible to determine whether an unsafe condition exists inside the tank. Mr. Melanson was not qualified in 2004 to perform an internal inspection of an ASME tank.

During refurbishment of the Propane Tank in 2004, Mr. Melanson recorded the tank's manufacturer as "AWT," shorthand for American Welding and Tank. He recorded the date of manufacture as 1962. This information was incorrect, as a subsequent forensic examination of the data plate revealed that the manufacturer was Chemitrol and the date of manufacture was 1970. Mr. Melanson admitted that he was not aware of his mistake in recording the information until recently. Because the data plate was illegible, Mr. Melanson had no knowledge of the Propane Tank's history at the time of refurbishing, including the normal contents of the vessel or whether there had been a previous inspection. He also did not know what the Current Jurisdictional Inspection Certificate consisted of, and had no knowledge regarding what an ASME Code Symbol Stamping, as referenced in Appendix H, meant.

After recording the incorrect information, Mr. Melanson removed the existing valves to the Propane Tank, and sandblasted the tank to bare steel. He visually inspected the tank's exterior, and found no visible signs of corrosion, dents or gouges. He did not conduct an internal inspection.

After inspecting the exterior of the Propane Tank, Mr. Melanson installed new valves and re-painted the tank. He then filled the Propane Tank with methanol, consistent with Ditech's internal policies, in order to minimize future internal tank corrosion. If a tank is consistently charged with methanol or propane, it will not significantly incur rust, corrosion, or internal damage. In November of 2004, Ditech recertified the Propane Tank and Highlands installed it on Plaintiffs' property on July 29, 2005. Between that time and the explosion on April 9, 2009, the Propane Tank was continuously charged with propane.

There is no evidence to suggest that Ditech's refurbishment of the Propane Tank contributed to the tank's explosion or that the valve that Ditech installed was in any way defective or contributed to the explosion.

**B.      Disputed Issues of Fact.**

There is a disputed issue of fact as to whether the Propane Tank was in above average condition prior to its refurbishment in 2004. There is also disputed expert testimony regarding the applicable standard of care and causation.

Plaintiffs' expert metallurgist, Joseph Parse, Ph. D., has opined that the Propane Tank failed due to various manufacturing defects which could only have been discovered by destructive metallurgical testing of the steel.[5] Dr. Parse does not hold himself out as an expert on the standards governing propane tank refurbishment or recertification and has not examined Ditech's role in refurbishing the Propane Tank.

---

[5] Specifically, Dr. Parse opines that the Propane Tank failed due to "defects of manufacture" because "[t]he steel of the failed head did not meet the specifications provided in ASTM [A285]: possessing excessive Yield & Tensile Strength, and substandard Ductility (consistent with Strain-Aged material)" and "[t]he manufacturing process introduced residual stresses in the region near the weld which caused cracking and crack growth, leading to the failure." (Doc. 150-1 at ¶ 7.)

Plaintiffs' fire cause and origin expert, David Eliassen, refers to Dr. Parse's theory that the Propane Tank failed due to a manufacturing defect and opines that due to a sudden and massive failure of the tank, the explosion preceded the fire. Mr. Eliassen is also not an expert in the standards governing propane tank refurbishment.

Dr. Parse's and Mr. Eliassen's expert opinions are disputed by Ditech's expert metallurgist, Jean Bigoney, Ph. D., who has also been cross-designated as an expert by Highlands and the Harsco Defendants.[6] Dr. Bigoney opines that "[t]he most likely scenario to explain the explosion of the tank on April 9, 2009 is that corrosion owing to moisture which had settled to the lowest portion of the tank had caused pits to form." (Doc. 203-1 at ¶ xx.)  She further opines that:

> The root technical cause of failure is deemed to be related to corrosion of the tank interior.  Given the age of the tank and its unknown history for at least 30 years, the possibility of improper storage at some period during that time and/or the accumulation of dissolved water in propane could easily have led to ingress of water.  Once water is present, it would settle to the bottom of the tank.  The fracture origin coincides with the lowest portion of the tank.  Furthermore, evidence for corrosion in the form of pits and cracks was found at the bottom of the tank.

*Id.* at ¶ xxi.

Ditech, while not proffering an expert on the applicable standard of care for refurbishment and recertification of propane tanks, relies on Section H-3000 of Appendix H, and asserts an internal inspection was not required.

Michael Sadowski has been designated and cross-designated, by the Harsco Defendants and Highlands, respectively,[7] as an expert in industry standards and practices regarding the refurbishment and conversion of ASME propone tanks.  According to Mr. Sadowski, industry standards do not simply require compliance with Appendix H, but

---

[6] Plaintiffs have not cross-designated Dr. Bigoney as an expert and they have not included her opinion in their response to Ditech's statement of undisputed material facts.

[7] Plaintiffs have not cross-designated Mr. Sadowski as an expert and they have not included his opinion in their response to Ditech's statement of undisputed material facts.

rather mandate that an interior inspection be performed prior to refurbishment of an ASME propane tank.

Mr. Sadowski opines that the applicable standard of care incorporates the National Boiler Inspection Code which he contends requires that a tank be presented for refurbishing with a legible data plate. If the data plate is not fully legible, he opines that industry practices and the applicable standard care require the tank not to be refurbished unless and until the owner of the tank provides sufficient information for the issuance of a new data plate. Mr. Sadowski further opines that the failure to perform a non-destructive interior inspection of the tank constitutes a breach of accepted industry standards. He notes that an internal inspection of a tank is nondestructive, takes very little time, has almost no cost, and is performed to look for signs of moisture, corrosion, or pitting in the interior. If an interior inspection of a tank reveals moisture, corrosion, or pitting, he asserts that industry standards of care require that the tank not be refurbished.

## II.     Conclusions of Law and Analysis.

The court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) and is thus required to apply Vermont law to the substantive issues. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012).

### A.     Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations and citation omitted). In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party

under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv.*, 991 F.2d 49, 51 (2d Cir. 1993).

To avoid summary judgment, the non-moving party must offer more than "mere speculation and conjecture[,]" *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, only "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

## B.   Ditech's Motion for Summary Judgment Re: Plaintiffs' Negligence Claims.

Ditech seeks summary judgment with regard to Plaintiffs' negligence claims, arguing that Plaintiffs have failed to proffer an expert opinion that establishes the applicable duty of care and which provides any basis for concluding that Ditech caused the Propane Tank's explosion. Plaintiffs counter that Ditech's own Fed. R. Civ. P. 30(b)(6) witness, Mr. Melanson, establishes that Ditech breached an applicable duty of care and contends further that there is sufficient evidence in the record that Ditech caused or contributed to the explosion to leave the determination of causation to the jury.

### 1. Duty of Care.

Plaintiffs allege that Ditech had a duty to "test, inspect, discover, remedy, restore, repair and/or warn of any defects in the strength, integrity and suitability" (Doc. 120 at ¶ 35) of the Propane Tank before it released the tank to Highlands for continued commercial use. Plaintiffs further allege that in releasing the Propane Tank to Highlands, Ditech certified the strength, integrity and suitability of the tank for its intended purpose, and Ditech assumed a legal duty to all users of the tank, including Plaintiffs.

8

As Ditech points out, Plaintiffs have not disclosed an expert on tank refurbishing. Ditech contends that Vermont law governing the manner of establishing the standard of care for "professionals" such as lawyers, *Estate of Fleming v. Nicholson*, 724 A.2d 1026 (Vt. 1998), and physicians, *Wilkins v. Lamoille Cnty. Mental Health Servs., Inc.*, 2005 VT 121, 179 Vt. 107, 889 A.2d 245, applies in this case. Vermont law does not appear to require that result. *See Fila v. Spruce Mtn. Inn*, 2005 VT 77, ¶ 20, 178 Vt. 323, 333, 885 A.2d 723, 730 (Vt. 2005) (observing defendant "has adduced no persuasive authority to support the proposition that expert evidence was required to show the level of care required of a residential care facility to protect its residents from rape.") (collecting cases); *see also Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473 n.6 (2d Cir. 1995) ("We do not mean to suggest that [plaintiff] necessarily had to submit expert evidence in order for her [negligence] claim to survive summary judgment. Other evidence could have done as well.") (citing Harper & James § 17.1, at 547) ("Except for malpractice cases (against a doctor, dentist, etc.) there is no general rule or policy *requiring* expert testimony as to the standard of care, and this is true even in the increasingly broad area wherein expert opinion will be received.").

Without deciding the issue, the court agrees that the standard for refurbishment and recertification of ASME propane tanks is not something within the knowledge of the average layperson. *See S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski*, 410 A.2d 1359, 1363 (Vt. 1980) ("It is the function of the jury as the trier of fact to draw the logical inferences from the evidence in light of their experience and knowledge. Where, however, the jury is incompetent to draw those inferences because they are distinctively related to a profession beyond the understanding of the average layman, it is necessary to introduce expert testimony."); *see also FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 91 (Tex. 2004) ("Few people not involved in the trucking industry are familiar with refrigerated trailers, the mechanisms for connecting them to tractors, and the frequency and type of inspection and maintenance they require. While the ordinary person may be able to detect whether a visible bolt is loose or rusty, determining when that looseness or rust is sufficient to create a danger requires specialized knowledge. Therefore, the

layman does not know what the standard of care is for the inspection and maintenance of the upper coupler assembly, kingpin, and base rail of a refrigerated trailer.") (footnote omitted).

As Plaintiffs point out, however, in *Lewis v. Vermont Gas Corp.*, 151 A.2d 297 (Vt. 1959), the Vermont Supreme Court arguably addressed the applicable standard of care where the service at issue involves propane. In *Lewis*, the plaintiff brought a claim against a public service corporation for injuries suffered in a propane explosion which occurred when the plaintiff attempted to light his hot water heater. In upholding a jury verdict in favor of the plaintiff, the court observed that a company that supplies natural gas and equipment related thereto knows that "it is dealing with a dangerous agency, and if it knows, or should have known, the consumer's lines and equipment are unsafe, it is its duty to require the lines to be repaired or else to shut off the gas at the curb." *Id.* at 306. The court further observed:

> Defendant concedes ownership of the meter and the responsibility for its inspection and maintenance. Propane air gas is an inherently dangerous substance. Well considered cases take the view that those who distribute a dangerous article or agent owe a degree of protection to the public proportionate to and commensurate with the dangers involved. Stated differently it has been held that a company which produces and furnishes gas is bound to use such skill and diligence in its operations as is proportionate to the delicacy, difficulty and nature of that particular business. As to its lines a gas company is not an insurer, but if the gas company fails to exercise care and injury results therefrom it is liable. In using the degree of care to prevent damage commensurate to the danger which it is its duty to avoid, generally this requires an efficient system of inspection, oversight and superintendence of its lines and equipment. Notice or knowledge of defects in pipes, etc., will be presumed where the circumstances are such that the company, by the exercise of proper and reasonable diligence might have known of the defect which caused the damage complained of. The duty of proper installation, maintenance and inspection of a meter furnished, owned and exclusively controlled by a public service corporation engaged in supplying natural gas, and all of the fittings by which it is attached to the service pipe, rests upon the corporation. Negligence, consisting of omission of such duty, and causing injury, imposes liability upon it.

*Id.* at 306 (internal citations omitted).

As applied to this case, *Lewis* required Ditech, which knew it was refurbishing and recertifying a tank that would be used for propane, to exercise a degree of care commensurate with the potential for danger posed if a defect or unsafe condition in the tank remained undetected. In accordance with this standard, a jury could rationally conclude that an inspection, refurbishment, and recertification process based upon inaccurate or missing information regarding the propane tank's age, origin, and prior history breached the applicable duty of care, even in the absence of expert testimony. *See Calcagni-Frazier-Zajchowski*, 410 A.2d at 1365 ("It is true, as defendant argues, that when a physical process is obscure, abstruse or so far outside common experience that lay jurors can only speculate about it expert testimony is required to explain the process. But when the facts proved are such that any layman would know, from his own knowledge and experiences, that the breach of duty was the proximate cause of the injury expert testimony is not necessary.") (internal citation omitted). Moreover, this is not a case in which there is no other evidence of the applicable standard of care. Ditech's designated corporate witness, Mr. Melanson, testified that Appendix H set forth the applicable standard of care and that in refurbishing and recertifying the Propane Tank, he neither complied with Appendix H, nor complied with Ditech's own internal safety policies.[8]

Examining the evidence in the light most favorable to Plaintiffs, Plaintiffs have adduced sufficient evidence of the applicable standard of care and Ditech's breach of that standard to survive summary judgment.

### 2. Causation.

In a similar vein, Ditech contends that because Plaintiffs have not cross-designated Dr. Bigoney and Mr. Sadowski as experts, Plaintiffs cannot rely on their opinions to

---

[8] *See Schwartz v. Hasbro, Inc.*, 2012 WL 1414094, at *9 (N.J. Super. Ct. App. Div. April 25, 2012) (court properly admitted evidence of breach of company's internal safety standards in suit involving negligence claim); *Brewster v. King Cnty.*, 2011 WL 4553156, *5 (Wash. Ct. App. October 4, 2011) (affirming denial of summary judgment where there was evidence that defendant "breached the standard of ordinary care by failing to properly locate the bus shelter in accordance with its own internal safety standards[.]").

establish causation. Without those opinions, Ditech points out that Plaintiffs are left with a theory of causation that asserts that the Propane Tank's explosion was caused by a manufacturing defect in the tank's steel that could not have been detected by Ditech through a non-destructive inspection. Accordingly, had Ditech complied with the alleged applicable standard of care, the alleged defect in the tank's steel would have remained undetected. Plaintiffs counter that they have adduced sufficient evidence of causation to render the issue a question for the jury.

Although Plaintiffs do not explicitly rely on the testimony of Dr. Bigoney and Mr. Sadowski, those expert opinions remain in the record and create a disputed issue of fact regarding causation. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012) ("[i]n ruling on a motion for summary judgment, the district court may rely on 'any material that would be admissible' at a trial."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of [the record], but is not required to do so."). In addition, Plaintiffs may be permitted to rely on the opinions of other parties' experts at trial even in the absence of cross-designation. *See Vandenbraak v. Alfieri*, 2005 WL 1242158, at *4 (D. Del. May 25, 2005) (holding that "an opposing party [may] use as substantive evidence an opinion propounded by the sponsoring party's expert"); *Kreppel v. Guttman Breast Diagnostic Inst., Inc.*, 1999 WL 1243891, at *1 (S.D.N.Y. Dec. 21, 1999) (finding that a party may use the report of an opponent's expert as substantive evidence under Fed. R. Evid. 801(d)(2)(B)). This, alone, is sufficient to defeat summary judgment as Dr. Bigoney's and Mr. Sadowski's theories of causation support a negligence claim against Ditech.

Plaintiffs, however, proffer an alternate theory of causation that would allow them to retain their experts' theory of causation (a manufacturing defect in the Propane Tank's steel which could not be detected by a non-destructive inspection) while contending Ditech's alleged negligence was a proximate cause of the Propane Tank's explosion. As they point out, Mr. Melanson's admissions creates a reasonable inference that had Ditech

followed its own internal safety procedures and those required by Appendix H, the Propane Tank would have never been refurbished and returned to service. In this manner, Plaintiffs contend that Ditech's alleged breach of the applicable duty of care was *a* proximate cause of Plaintiffs' injury. Vermont law explains how such a claim may exist even where, as here, Ditech neither knew of the alleged defect in the tank's steel, nor, could reasonably detect its existence:

> Where a second actor has become aware of the existence of a potential danger created by the negligence of an original tort-feasor, and thereafter, by an independent act of negligence, brings about an accident the first [actor] . . . is relieved of liability, because the condition created by him was . . . not its proximate cause. Where, however, the second actor does not become apprised of . . . [the] danger until his own negligence, added to that of the existing perilous condition, has made the accident inevitable, the negligent acts of the two . . . are contributing causes and proximate factors in the happening of the accident and impose liability upon both of the guilty parties.

> To put these concepts together, the test for defendant's negligence in this instance is whether or not he was bound to anticipate the negligence of another. If not, he is not liable. In instances where he is bound to anticipate negligence, *Johnson* [*v. Cone*, 28 A.2d 384 (Vt. 1942)] provides that he shall still not be liable if the second actor, once aware of the particular danger involved, knowingly and negligently proceeds; but he shall be jointly liable where the negligence of the second acts in concert with his own negligence, inevitably causing the injury.

*Paton v. Sawyer*, 370 A.2d 215, 217 (Vt. 1976); *see also Dodge v. McArthur*, 223 A.2d 453, 455 (Vt. 1966) (observing that an "intervening cause" "may act as a mere limitation on a defendant's responsibility for the total consequences of an accident, or it may intervene ahead of any injury and become the responsible cause for all damage."). As applied to this case, *Paton* instructs that both the manufacturer who allegedly created a defect in the Propane Tank and Ditech, whose alleged negligence caused the Propane Tank to be returned to service thereby making the accident inevitable, "are contributing causes and proximate factors in the happening of the accident" permitting liability to be imposed on both of them. *Paton*, 370 A.2d at 217.

Under Vermont law, "[d]etermination of proximate cause requires a finding by the trier of fact except in rare circumstances." *Bloomer v. Gibson*, 2006 VT 104, ¶ 49, 180 Vt. 397, 416, 912 A.2d 424, 437; *see also Fritzeen v. Trudell Consulting Eng'rs, Inc.*, 751 A.2d 293, 297 (Vt. 2000) (mem.) ("Proximate cause is ordinarily an issue to be resolved by the jury unless the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way.") (quotations and citations omitted). "Thus, it is the fact-finder's task to find proximate cause, especially where there are various possible causal contributors to an event, such that '[t]he proof and facts . . . do not lend themselves to . . . singular clarity.'" *Bloomer*, 2006 VT 104, ¶ 49, 180 Vt. at 416, 912 A.2d at 437 (quoting *Fritzeen*, 751 A.2d at 297).

Viewing the evidence in the light most favorable to Plaintiffs and drawing all inferences in their favor, the cause of the Propane Tank explosion remains disputed. Because there is admissible evidence that Ditech's own alleged negligence caused or contributed to the Propane Tank explosion by permitting the Propane Tank to be refurbished, recertified, and returned to use, the question of causation must be resolved by the jury. Ditech's motion for summary judgment regarding Plaintiffs' negligence claims is therefore DENIED.

### B.   Ditech's Motion for Summary Judgment Re: the Amended Crossclaims of Highlands and the Harsco Defendants.

#### 1.   Crossclaims for Contribution.

Ditech moves for summary judgment with regard to Highlands's and the Harsco Defendants' amended crossclaims seeking, among other things, a right of contribution for the amount of any judgment rendered against them in favor of Plaintiffs. Vermont law bars a claim for contribution among joint tortfeasors. *See White v. Quechee Lakes Landowners' Ass'n*, 742 A.2d 734, 736 (Vt. 1999) (holding "[t]he right to indemnity . . . is an exception to our longstanding rule barring contribution among joint tortfeasors[.]"); *Loli of Vermont, Inc. v. Stefandl*, 968 F. Supp. 158, 161 (D. Vt. 1997) ("Under Vermont law, there is no right to contribution among joint tortfeasors"). Summary judgment with

regard to Highlands's and the Harsco Defendants' crossclaim for contribution is thus hereby GRANTED.

### 2.    Strict Product Liability and Breach of Warranty Crossclaims.

Highlands and the Harsco Defendants allege that Ditech failed to refurbish the Propane Tank in a safe manner, thereby placing the Propane Tank in the stream of commerce in a defective condition which caused the Propane Tank explosion, which, in turn, caused Highlands and the Harsco Defendants to suffer damages, including, but not limited to, any potential liability to Plaintiffs. On this basis, they assert strict product liability crossclaims, and Highlands additionally asserts a breach of the implied warranties of merchantability and fitness for a particular purpose crossclaim, against Ditech. Ditech asserts that summary judgment is mandated because it is undisputed that it did not "sell" the Propane Tank. Citing New Jersey law, Highlands counters that reconditioners of products may be held strictly liable under products liability law and there is no requirement that a reconditioner take title to the product. Without joining in this argument, the Harsco Defendants argue that "[o]bviously, a defendant may be liable in strict products liability without being a tort-feasor." (Doc. 203 at 8.)

The Court of Appeals for the First Circuit recently rejected the line of New Jersey cases on which Highlands relies, noting that the "[t]he 1982 New Jersey case on which plaintiffs rely, and which does not discuss the Restatement (Second) of Torts § 404, does not persuade us that Massachusetts would follow its reasoning." *Hatch v. Trail King Indus., Inc.*, 656 F.3d 59, 70 (1st Cir. 2011) (citing *Michalko v. Cooke Color & Chem. Corp.*, 91 N.J. 386, 451 A.2d 179 (1982)). The New Jersey courts have also distinguished *Michalko* and its progeny, holding that, there, the defendant *rebuilt* the transfer press and *manufactured* a defective component part and it was on that basis that strict product liability was imposed. *See Potwora ex rel Gray v. Grip*, 725 A.2d 697, 703 (N.J. Super. Ct. App. Div. 1999) (observing that "[h]ere, unlike *Michalko*, the motorcycle helmet worn by plaintiff was never in the control of Royal, and Royal did not manufacture any component part of the helmet. . . . Under these circumstances, Royal did not place the helmet within the stream of commerce and it was not the manufacturer or

seller of the helmet"); *Ramos v. Silent Hoist and Crane Co.*, 607 A.2d 667, 671 (N.J. Super. Ct. App. Div. 1992) (finding that electrician, who installed and designed the electrical system and placement of switches to the capstan which injured plaintiff, did not sell, manufacture, or supply a defective component part, distinguishing the case from *Michalko* where "the principal activity of the defendant was the creation or change of the product"). Here, no party contends that Ditech manufactured or installed a defective part that caused the Propane Tank explosion. Accordingly, even under New Jersey law, Ditech would not be liable.

The Vermont Supreme Court has adopted the doctrine of strict product liability set forth in the Restatement (Second) of Torts §402A (1965):

> (1) One who *sells any product* in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> > (a) the seller is engaged in the business of selling such a product, and
> >
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Darling v. Cent. Vt. Pub. Serv. Corp.*, 762 A.2d 826, 827 (Vt. 2000). A claim of breach of an implied warranty of merchantability or fitness for a particular purpose shares this same analytical framework.[9]

Ditech contends that it provided refurbishment services and was not a "seller" of goods, and did not "sell" the Propane Tank to anyone. Vermont law requires "seller" status as an essential component of a strict product liability or breach of implied warranty claim. *See Darling*, 762 A.2d at 569 ("Because CVPSC did not sell the electricity that allegedly caused the fire in this case, the trial court correctly refused to instruct the jury to apply the doctrine of strict product liability."); 9A V.S.A. § 2-314(1) (providing for an

---

[9] *See Wilson v. Glenro, Inc.*, 2012 WL 1005007, at * 7 (D. Vt. March 23, 2012) ("Plaintiff's claims of strict liability [and] breach of warranty . . . [are] governed by the same analytical framework."); *Adel v. Greensprings of Vermont, Inc.*, 363 F. Supp. 2d 692, 699 (D. Vt. 2005) ("Liability for breach of warranty . . . is congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965), which defines the strict liability of a seller for physical harm to a user or consumer of the seller's product.") (quotation omitted).

implied warranty of merchantability when "the seller [of goods] is a merchant with respect to goods of that kind"); 9A V.S.A. § 2-315 (providing an implied warranty of fitness for a particular purpose when "the seller [of goods] at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods."); *see also Green Mountain Mushroom Co. v. Brown*, 95 A.2d 679, 681-82 (Vt. 1953) ("The raising of an implied warranty of fitness depends upon whether the buyer informed the seller of the circumstances and conditions which necessitated his purchase of a certain character of article or material and left it to the seller to select the particular kind and quality of article suitable for the buyer's use."); *Wing v. Chapman*, 49 Vt. 33, 35 (1876) ("If a man sells an article, he thereby warrants that it is merchantable - that it is fit for some purpose. If he sells it for a particular purpose, he thereby warrants it fit for that purpose[.]"); Restatement (Second) of Torts § 402(A) cmt. a ("This Section states a special rule applicable to sellers of products.").[10]

At best, Highlands and the Harsco Defendants assert that Ditech's refurbishment of the Propane Tank was so extensive that it was *like* the sale of a new product. This will not suffice where the primary objective of the transaction remains the provision of a *service*. *See, e.g., Hennigan v. White*, 130 Cal. Rptr. 3d 856, 863 (Cal. Ct. App. 2011) ("As a condition precedent to maintaining a strict products liability claim, a plaintiff must show the transaction in which she obtained the product was one in which the transaction's primary objective was to acquire ownership or use of a product, and not one where the primary objective was to obtain a service. Courts have not extended the doctrine of strict liability to transactions whose primary objective is obtaining services.")

---

[10] Highlands predicts that it is likely that the Vermont Supreme Court will adopt at least some portion of the Restatement (Third) of Torts (1998) in the future. However, that prediction is unavailing because the Third Restatement would not dictate a different result. *See* Restatement (Third) of Torts §§ 1, 20 (expanding strict liability to those "engaged in the business of selling or otherwise distributing products" and defining those terms as a business that either "transfers ownership" or "provides the product" but excluding "persons assisting or providing services to product distributors" and who thereby "indirectly facilitate[] the commercial distribution of products"); *Id.* at § 19(b) ("Services, even when provided commercially, are not products.").

(citations and internal quotation marks omitted); *Smith v. Alza Corp.*, 948 A.2d 686, 693 (N.J. Super. Ct. App. Div. 2008) ("Irrespective of whatever other activities a seller may be engaged in, the sale of the product is the defining characteristic for qualification as a "product seller."); *New Texas Auto Auction Services, L.P. v. Gomez De Hernandez*, 249 S.W.3d 400, 401 (Tex. 2008) (reversing court of appeals' determination that auto auctioneer could be liable in both strict liability and negligence for auctioning a defective car and noting that "product-liability law requires those who *place* products in the stream of commerce to stand behind them; it does not require everyone who *facilitates* the stream to do the same."). The fact that Ditech supplied a new valve or other items in the processing of refurbishing the Propane Tank does not alter this conclusion. *See Meadows v. Anchor Longwall and Rebuild, Inc.*, 2006 WL 995842, at *5 (W.D. Pa. April 17, 2006) (company hired to refurbish product and replace a valve was "hired to provide a service. The fact that providing that service required it to replace a valve does not render it a supplier of valves, a seller of valves or a marketer of valves."); *BancorpSouth Bank v. Environmental Operations, Inc.*, 2011 WL 4815389, at *5 (E.D. Mo. Oct. 11, 2011) ("None of the Defendants were sellers of a product within the meaning of § 402A. Defendants may have provided [certain items], however, these specifically designed items were incident to the services provided by defendants[.]").

Because Highlands and the Harsco Defendants cannot establish that Ditech was a "seller" of the Propane Tank, or furnished a defective component part, summary judgment on their strict product liability and Highlands's breach of implied warranty crossclaims is hereby GRANTED in Ditech's favor.

### 3. Negligence Crossclaim.

Count III of Highlands's amended crossclaim alleges that Ditech has a duty to Highlands to refurbish the Propane Tank in a safe manner and that Ditech breached that duty by, "among other actions or inactions, fail[ing] to inspect properly the Propane Tank for internal corrosion and fail[ing] to inspect properly the manufacturer's data tag." (Doc. 194 at ¶ 23). As a result of the alleged breach, Highlands contends it has suffered damages, including "being subject to the claims brought by Plaintiffs." *Id.* at ¶ 24.

"Common law negligence has four elements: a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury." *Zukatis v. Perry*, 682 A.2d 964, 966 (Vt. 1996). In seeking summary judgment, Ditech argues that it "did not owe Highlands Fuels or the plaintiffs a duty to ensure against the failure of the tank." (Doc. 150 at 12.) Ditech notes that it has deposed Highlands's standard-of-care expert, Lester MacLaughlin, who allegedly opined that Highlands was negligent in filling the Propane Tank when the manufacturer's data plate was illegible. Ditech advised that it would supplement its motion for summary judgment and statement of facts upon receipt of the MacLauglin deposition transcript; it has not done so. Accordingly, the court has before it only a partial record and a partial argument. On this basis alone, denial of Ditech's motion for summary judgment with regard to Highlands's negligence crossclaim would be appropriate.[11]

However, denial of Ditech's motion is warranted for the further reason that there is ample, albeit disputed, evidence of the applicable standard of care and Ditech's alleged breach of that standard of care. Highlands has cross-designated Ditech's expert, Dr. Bigoney, and the Harsco Defendants' expert, Mr. Sadowski, regarding causation and the applicable standard of care. Dr. Bigoney has opined that the cause of the Propane Tank's failure was internal corrosion and Mr. Sadowski has opined that Ditech had a duty to inspect the Propane Tank for internal corrosion, that its failure to do so was a breach of the applicable duty of care, and that had it refused to refurbish and recertify the Propane Tank as required by the applicable standard of care, the Propane Tank would not have been returned to service. Ditech's corporate representative, Mr. Melanson, acknowledged that Ditech breached its own internal safety standards and Appendix H by

---

[11] *See Jimmo v. Sebelius*, 2011 WL 5104355, at *22 n.13 (D. Vt. Oct. 25, 2011) (declining to address grounds for dismissal that were only cursorily addressed in the briefing); *Ibarra v. City of Chicago*, 2011 WL 4583785, at *8 (N.D. Ill. Sept. 28, 2011) ("Given the complexity of the legal issues, the parties' cursory treatment of the issues, and the current stage of the litigation, the Court declines to dismiss Count II at this time."); *Allstate Ins. Co. v. Heil*, 2007 WL 4270355, at *2 n.2 (D. Haw. Dec. 6, 2007) ("Because the parties have not briefed the Rule 702 issue in anything more than a cursory way as part of their summary judgment arguments, the court declines to resolve the expert admissibility issues on the record before it.").

refurbishing and recertifying a propane tank with an illegible data plate, and that had it followed those internal standards and Appendix H, the Propane Tank would have been taken out of service. This is sufficient evidence with regard to each essential element of a negligence claim to survive summary judgment.[12] Ditech's motion for summary judgment as to Highlands's negligence crossclaim is therefore DENIED.

### 4. Indemnification Crossclaims.

Ditech seeks summary judgment with regard to Highlands's and the Harsco Defendants' indemnification crossclaims, arguing that because Plaintiffs allege that these parties have active fault, implied indemnification is precluded as a matter of law. Ditech further argues that because it owed no duty to either Plaintiffs, Highlands, or the Harsco Defendants to ensure against the Propane Tank's failure; in the absence of such a duty, no claim for indemnification exists. Highlands and the Harsco Defendants assert that summary judgment is inappropriate where the facts regarding the parties' alleged fault and relative fault are disputed.

Under Vermont law, "[t]he right to indemnity, which is an exception to [Vermont's] longstanding rule barring contribution among joint tortfeasors, exists only when one party has expressly agreed to indemnify another, or when the circumstances are such that the law will imply such an undertaking." *White,* 742 A.2d at 736-37 (internal citations omitted). The party asserting a claim of implied indemnification has the burden of establishing its entitlement to it. *Id.* at 738. Noting that it is "difficult to state a general rule that will cover all cases," *id.* at 737, the *White* court adopted the Restatement of Restitution § 96 (1937) which provides:

---

[12] The parties have not briefed the applicability of the economic loss rule to Highlands's negligence claim. The economic loss rule "prohibits recovery in tort for purely economic losses." *Long Trail House Condo. Ass'n v. Engelberth Construction, Inc.,* 2012 VT 80, at ¶ 10 (quoting *EBWS, LLC v. Britly Corp.,* 2007 VT 37, ¶ 30, 181 Vt. 513, 928 A.2d 497). In *Long Trail,* the court recognized a "professional services" exception to the economic loss doctrine but concluded that it did not apply to a construction contractor whose duties were governed by contract, not tort, where only economic harm was alleged. *Id.* at ¶ 21. Because Ditech does not seek summary judgment on this basis, the court proceeds no further with an analysis without the benefit of the parties' briefing.

> Where a person has become liable with another for harm caused to a third
> person because of his negligent failure to make safe a dangerous condition
> of land or chattels, which was created by the misconduct of the other or
> which, as between the two, it was the other's duty to make safe, he is
> entitled to restitution from the other for expenditures properly made in the
> discharge of such liability, unless after the discovery of the danger, he
> acquiesced in the continuation of the condition.

*Id.* at 737. Because "indemnification shifts the *entire* loss from one party to another, one who has taken an active part in negligently injuring another is not entitled to indemnification from a second tortfeasor who also negligently caused the injury." *White*, 742 A.2d at 737 (internal citation omitted). "Rather, indemnification accrues to a party who, without active fault, has been compelled by some legal obligation, such as a finding of vicarious liability, to pay damages occasioned by the negligence of another." *Id.* (quoting *Morris v. American Motors Corp.*, 459 A.2d 968, 974 (1982)).

Under Vermont law, there need not be a complete absence of fault on the part of the party seeking indemnity. *DiGregorio v. Champlain Valley Fruit Co.*, 255 A.2d 183, 186 (Vt. 1969). Rather, a court may find a right to indemnification when the "plaintiffs' fault in its duty to the injured person was secondary to the initial negligence of the defendant," *DiGregorio*, 255 A.2d at 186, or "[w]here the parties are not in equal fault[.]" *Morris v. American Motors Corp.*, 459 A.2d 968, 974 (Vt. 1982). In general, "indemnity will be imputed only when equitable considerations concerning the nature of the parties' obligations to one another or the significant difference in the kind or quality of their conduct demonstrate that it is fair to shift the entire loss occasioned by the injury from one party to another." *White*, 742 A.2d at 737.

Courts examine "the totality of circumstances" to determine whether a party is entitled to indemnification. *Savage v. Walker*, 2009 VT 8, ¶ 8, 185 Vt. 603, 606, 969 A.2d 121, 125 (citation and internal quotation marks omitted). Because the analysis requires an examination of the facts to determine the nature of the fault, that determination cannot be made on the basis of the plaintiffs' allegations alone because "allegations . . . do not, in themselves, prove anything about the true cause of the accident." *Chapman v. Sparta*, 702 A.2d 132, 134-35 (Vt. 1997).

In this case, there remains a factual dispute regarding not only the cause of the Propane Tank explosion, but regarding whether Ditech could and should have detected the alleged cause during the refurbishment and recertification process. Until these disputes are resolved by the finder of fact, the court cannot determine, as a matter of law, whether Highlands or the Harsco Defendants, or both, were actively at fault in causing the Propane Tank explosion and, if so, whether that fault was significantly different in nature and degree from the fault, if any, of Ditech. *See White*, 742 A.2d at 737.

However, "[a]n obligation to indemnify does not arise merely from the disparate quality of independent torts[,]" *Hiltz v. John Deere Indus. Equip. Co.*, 497 A.2d 748, 751 (Vt. 1985), and "[t]he law imposes no implicit obligation upon the purchaser of a product to indemnify the manufacturer." *Id.* (citing *William H. Field Co., Inc. v. Nuroco Woodwork, Inc.*, 115 N.H. 632, 634, 348 A.2d 716, 718 (1975) (no duty flowing "upstream" from purchaser to manufacturer giving rise to obligation to indemnify); 2A A. Larson, Workmen's Compensation Law § 76.84, at 14-752 n.49 (1983 & Supp. 1984) (citing cases finding no obligation on purchaser to indemnify manufacturer)). "Thus, under Vermont law, one is not entitled to indemnity from a joint tortfeasor merely because one may be free from negligence, or another is more at fault." *Id.*

Here, it is undisputed that Ditech neither supplied a defective component part to the Propane Tank, nor owed any contractual obligation to the Harsco Defendants in refurbishing it. The Harsco Defendants fail to cite any other source of a legal duty flowing "upstream" from the servicer of a product to its manufacturer. In turn, if the Harsco Defendants have no independent fault they cannot be held liable merely because Ditech, an unrelated servicer of the product, breached a duty of care. Under *Hiltz*, in the absence of a duty, no claim for indemnification lies regardless of the parties' relative fault. *See Hiltz*, 497 A.2d at 751. Ditech's motion for summary judgment with regard to the Harsco Defendants' indemnification claim is therefore GRANTED.

A different result is required for Highlands's claim for indemnification. There is admissible evidence to support a conclusion that Ditech owed both Highlands, with whom it contracted, and Plaintiffs, the foreseeable users, a duty of care with regard to

Ditech's inspection, refurbishment, and recertification of the Propane Tank. There is also admissible evidence that Ditech breached this duty of care. If Plaintiffs prevail on their negligence claims against Ditech, and a jury further concludes that Highlands's only fault consisted of selecting Ditech as the Propane Tank's refurbisher, the parties' fault would not be equal. Instead, Highlands's fault would be secondary and derivative of the fault attributed to Ditech. Consistent with that finding, a jury could nonetheless also conclude that Highlands remains directly liable to Plaintiffs for furnishing them with a defective Propane Tank. In such circumstances, a duty to indemnify may be implied. *Hiltz*, 497 A.2d at 751 ("An obligation of indemnity has been imposed where the relationship of the parties is such that the obligations of the alleged indemnitor extend not only to the injured person, but also to the indemnitee."); Prosser and Keeton on The Law of Torts § 51, at 341-42 (5th ed. lawyer's ed. 1984) (indemnity may be implied where a party is held responsible solely by imputation of law because of relation to actual wrongdoer).

At this juncture, because the facts are disputed regarding whether a duty of care was breached and by whom, and because causation and relative fault have yet to be established, it is impossible to determine whether Ditech may owe Highlands a duty of implied indemnification. In such circumstances, summary judgment is inappropriate.

For the foregoing reasons, Ditech's motion for summary judgment as to Highlands's indemnification crossclaim is hereby DENIED.

## CONCLUSION

In summary, Ditech's motion for summary judgment is DENIED with regard to Plaintiffs' and Highlands's negligence claims. Ditech's motion for summary judgment is GRANTED with regard to the strict product liability crossclaims of Highlands and the Harsco Defendants. Ditech's motion for summary judgment is GRANTED with regard to Highlands's breach of implied warranty crossclaims. Ditech's motion for summary judgment is GRANTED as to the indemnification crossclaim of the Harsco Defendants and DENIED as to the indemnification crossclaim of Highlands.

SO ORDERED.

Dated at Rutland, Vermont in the District of Vermont this ___ day of January, 2013.

Christina Reiss, Chief Judge
United States District Court